May it please the Court, my name is Michael Rossman, I represent the appellants. I'd like to focus the Court's attention on two requirements of the Bakke, Rutter, and Gratz cases. First Counsel, for my benefit, would you please speak up a little bit? Absolutely. It says pointed at my chin. Is this better? Much better. I want to focus on two requirements of the Bakke, Gratz, and Grutter cases. First, although diversity characteristics can be weighed differently, they should be placed on the same footing for consideration, which suggests that there's a certain element of procedural fairness involved with these cases. And second, that the schools involved must give consideration to serious race-neutral alternatives, not necessarily all of them, but serious ones. I believe that there are at least three elements of the system of admissions at the University of Washington Law School in the years in question that violated these precepts. First, they issued a letter that allowed people to supplement their personal statements about diversity, but this letter, after the deadline and beyond the word limit, never went to whites. But doesn't the Supreme Court say that universities may consider race as a plus factor? Absolutely right. All right. Having said that, wouldn't it very well be justification, since these are members of a minority race, to get additional facts about these particular people, because race can be considered a plus factor? And that, Your Honor, is what I think violates the precept that they be placed on the same footing for consideration. You're not giving a – there is an element of procedural unfairness about only allowing racial minorities and not other people to add to their statement and provide additional supplemental information about what diversity they can bring to the school. There's also – How would that be implemented, for example? Let's suppose, then, that this option was available to everybody. How would it be triggered? What would trigger it? Well, it's unclear how it is triggered – or how it was triggered in 94, 95, and 96, but I would suggest that if there's elements of an individual's application that would suggest that additional information would be worthwhile, then the school ought to, in a race-neutral way, send out such letters, not just to minorities who might be able to supplement their diversity statements, but to whites who might also be able to supplement their diversity statements. So how would that be applied to any of your clients? Well, certainly, even under defendant – even defendants conceded that Keturah Smith would have been a much stronger candidate had she been given that opportunity. There were things in her record that she did not, unfortunately, put in her initial statement, but she never had the same opportunity as others who were not of her race did to supplement that statement. Tell me, would it work? What I'm wondering is whether the only kind of information in the letter that matters to the university is information that the person has some non-white blood. If all they care about is blood, then even if the white person showed, well, like that Jewish refugee who was beaten up in Moldova or some terrible place, they don't care. Wrong color. Well, that's not what the letter says, though. The letter says they ask for additional information about your family background and cultural ties, not the race of your people. Does it mean anything but blood? I would hope so, yeah. I would hope family background and cultural ties means far more than just blood. But if race may be a plus factor, and they want to consider it, among those of a different race, why wouldn't it be relevant to, among those people, find out those who have the greatest ties, have the greatest connection with their race, which may be a plus factor? There's nothing wrong with it. But the pro – there's nothing wrong with doing that as long as you're doing something similar for other people and putting all diversity characteristics on the same footing for consideration. Well, then what does it mean that race is a plus factor? Because it can be used as a positive factor. Someone's race can be used as a positive factor. As long as you are considering that diversity factor along with other diversity factors on the same footing for consideration, and that's – My point is in considering race, there may be many things you want to consider by those of a different race. Being white or Caucasian is not a plus factor. That's correct, Your Honor. But there are many diversity characteristics that white people can add to an instance. Indeed, they can. But because race is specifically a plus factor, why wouldn't a university want to know as much about those people for whom that plus factor may be applied? I guess my point, Your Honor, is not that they wouldn't want to know as much as possible, but that they'd also – But they're not permitted to know. Hmm? You're saying they would not be permitted to know unless they asked everybody. Well, I would put your question the following. Why wouldn't they want to know about the diversity characteristics of everyone and not just minorities? Indeed. And they should. They do want to know, but not necessarily in the same way they would about those for whom race is a plus factor. Well, again – That they want to know in those letters. I'm thinking, does race lose its plus factor characteristic if the applicant for admission is the child of, say, a professor at the university who's one of the preferred races? I don't believe that it does, no, Your Honor. So what does it matter? What do they want to know in the letter besides race? Well, because there are other diversity characteristics that the law school took into account aside from race, and this was giving some people by race an advantage to supplement their personal statement to identify others. What are the others that would be exposed in the letter that the law school takes account of? Well, the letter specifically asks for family background and cultural ties. The policy permits virtually anything to be identified as a diversity characteristic. Now, in addition to giving – You took all the depositions, and you know which ones they really take account of and which ones they don't. Family background and cultural ties are mentioned in the letter. Who – what helps applicants get in as a diversity factor other than blood? Do you understand my question? I do not. I apologize, Judge Kleinfeld. One thing that helps an applicant get in is if they're in one of the preferred racial or ethnic groups. Yes. The theory of these letters is maybe there are other diversity characteristics besides blood, besides having the right ethnic or racial characteristic that the law school prefers that help people get in. Correct. Yes. I believe there are too many volumes of excerpts of record for me to be sure that I know what works. But I know that the discovery has been done. What works besides blood? Oh, well, I mean, one of the interesting aspects of the trial is that different reviewers looked at different things. Some reviewers would say, well, somebody traveled to Minnesota one year. That counts as a diversity characteristic. Other reviewers would look at – That sounds like a hypothetical that was not illustrated by a real case. Was there anyone who got in because they went to Minnesota? There were – Exotic Minnesota? I don't know. Minnesota may not be the correct example, Your Honor. I doubt that it is. Give me something real from the discovery. Your Honor, I believe that, for example, going to a foreign country and living there for a while, for example, was an additional diversity characteristic that they would consider. Working in public service was considered a diversity characteristic that they would – Writing a book, forming a business, things of that nature. I would think that that's correct, Your Honor. And that's, of course, the point, is that white people are – Okay. So a white person who had formed a business or worked in public service or spent time in a foreign country would not be able to supplement the racial groups that gets the letter would. Is that the idea? That's correct, Your Honor. Can I ask a question then related to that? I'm looking at the letter, and it says, in essence, we notice you checked a racial or ethnic origin box, and the information you've given us is insufficient, and they want this supplemental information. Now, if they were only interested in the applicant because they were a minority, why would they need to send the letter out? Doesn't this suggest that what they're looking for is, okay, we've targeted you. This is a plus factor because of your minority status, because of your race. But before we automatically or just unknowingly give you credit for that, we need to know whether, in fact, you're going to then, if you're admitted as a minority person, add to the diversity. Why doesn't that letter, therefore, implement a individualized judgment that Grutter says needs to be made so that they aren't simply reacting to whether they're black or Hispanic or Asian? First, Your Honor, the letter that you've used, the form letter, but if you look at the actual letters that were sent to people, they're a little different, and they don't say insufficient. We think this is insufficient. It says we'd like to give you an opportunity to supplement. And, again, the problem to the reason that they sent the other form of the letter was different from what is set forth in this Exhibit 35. Yes. That's correct, Your Honor. And if the other thing is that Judge Silley did find that race, qua race, was a positive factor. So it is finding a fact in the court process. No, I understand it. Well, Grutter says it can be a positive factor. Absolutely. My question is, are the, with that regard, then, to the form of the letter, why, I think I'm still interested in the answer to my question, if they decide to plus an African American as a hypothetical or as a real case instance, and they ask for supplemental information to know, to help them decide whether in picking that person, plussing them on the basis of minority, there is more information about them that will suggest that that minority candidate will, in fact, further the diversity goals, why is that impermissible under Grutter? Because, again, Grutter talks about individualized assessments. Your Honor, it's, the focus should not be on sending the minorities letter, but why whites were never sent the letter. And that's what makes it impermissible, Your Honor, is that there was a different presentation. They aren't going to plus whites. So the point is, is if they're trying to engage in a effort to create diversity on simply other than color, in other words, to create a minority representation, but not do it just because somebody is black or Asian, what is the constitutional prohibition or disadvantage in not seeking information about that category of people which Grutter has now affirmed they can take into account to be selective amongst that universe to make sure they're advancing the purpose of the diversity program in the first instance? First, Your Honor, again, as I think it was clear that you could not answer the record at all and still get a very substantial plus on account, excuse me, not answer the letter at all and still get a very substantial plus on account of race. And I would disagree, I think, Your Honor, respectfully, with the premise that you don't give a plus for whites. You give a plus to whites for diversity characteristics that they may have. And the problem is that the diversity characteristics weren't considered on the same footing. That is to say, the same procedures did not apply. And a race equal alternative. You're saying, if I understand your logic right, you're saying the letter is fine. What's not fine is not sending the letter to everyone. And the reason it matters is that a white could also show diversity characteristics like living in a foreign country in the letter. So if you're going to send the letter, great. Send it to everyone who's not in the certain admit or certain reject category. Or a more accurate. Is that the logic right? Yes. Never sending it to a white person. Never sending anything to a white person is the problem. I'd like to focus for just a moment on the advantage that the school gave to Asian-American applicants. The defendants go on in their brief at great length about the virtues of these candidates and the other kinds of diversity that they bring to the school. And we don't dispute that at all, but it only shows that there was, in fact, a race-neutral alternative with respect to these specific candidates that the law school never seriously considered. That is to say, to consider their nonracial diversity. And it seems clear that, from the record, that there would have been a significant number of Asian-Americans in the school had they done so. And no one ever testified why the marginal increment in the proportion of Asian-Americans in the school was necessary to achieve the compelling interest. Help me on something here. I'm trying to figure out the relationship between something that came up in Adirond and something in the Grutter and Gratz and Bakke cases. In Adirond, the Supreme Court was concerned about the failure of adequate tailoring because of the Aleuts. Obviously, Richmond has no history of discriminating against Aleuts. Aleuts come from the Aleutian Islands in Alaska. Not likely to be a whole lot of them in Richmond. It looked arbitrary. Here, you've got some categories that look similarly arbitrary, both in who gets a good category and who doesn't get a good category. And I'm wondering whether that Adirond analysis has any application or whether it just doesn't have any application, because you don't need a past history of discrimination.  What you do need is to seriously consider race-neutral alternatives, which suggests that if there is a group that could achieve the goal of diversity in the school without a racial preference, you ought not to use it. Your Honors, I would like to reserve the remainder of my time for rebuttal. Thank you. Thank you, counsel. May it please the Court. My name is Michael Madden. I represent the University of Washington Law School and the individual defendants appellees in this matter. I suspect I'm not going to get far before your questions start, but I would like to begin by indicating that I think that your analysis would be facilitated by categorizing the issues into two categories here. The first is, did the university's law school's admissions practices during 1994 to 1996 so far depart from the standards in Bakke and Grutter as to render them unconstitutional? In this regard, it is now undisputed that the law school's policy served a compelling interest. It's also undisputed that the university's policies and systems met the paramount or hallmark requirements of narrow tailoring, those being the law school's standards. Let me ask you a couple of questions that are more specific. Thank you. Could you just give us the second category? Yes. The second category is, if there were constitutional defects, is liability nevertheless precluded by the district court's findings of fact that these plaintiffs would not have been admitted? Okay. Thank you. Thank you. I had a couple of questions. One was, does the school take account of diversity factors other than blood? Oh, yes. And the district court expressly found that the school took substantial account of nonracial diversity factors and, in fact, on the numbers. Which ones help a student get in besides blood? Certainly. Finding of fact 60, the district court identified that or found that the admissions dean said that she would not admit anyone who did not have one or more diversity factors. These included race, unusual life experiences, foreign language skills, geography, post-college work, advanced degrees, disabilities, achievements in athletics, business or the military, public service. Now, granted that that's so, and granted there are a bunch of people in the category who are not certain admits or certain rejects. Correct. But in the middle, where their admission may be affected by diversity characteristics, I don't understand the justification for sending the letter only to people in certain racial groups that invite supplementation to explain diversity characteristics. I had the same question as Judge Fischer did. Why would you need the letter if whites can't get a plus anyway? But it sounds like whites can get a plus, so the letter would be pertinent. And what's the justification for not sending it? I think Judge Fischer had that as well. The directions on the application form, I forget the exhibit number, but it's in the record, invite applicants to set forth how in their view they believe that their presence would contribute to the diversity of the school. They also ask in a separate block for applicants to identify their race. Now, if the intent of the letter, and this is what the district court found, was if someone checked that they were of a minority race, but gave no indication how that would enhance the diversity of the school, and I think the suggestion in the record was this is particularly a concern with respect to Native Americans, but the letters were sent to African Americans, Hispanics, and people of other races. So if they didn't indicate in the text, their essay, how their background would contribute, the school wanted to be cautious about giving a plus. And so I think the point is here, okay, we're talking about intentional description. Kennedy. You mean you lose your racial plus if your letter shows your professor's chapter? Well, let me, again, direct you to Judge Zilli's finding 60, that where he said the court finds that race was never the sole determining factor in Madrid's decision to admit. Rather, she considered race and all other applicable diversity factors. And so, yes, you could lose it. But it doesn't say that. It doesn't say that you can lose it. The finding doesn't say that. That's right. But the point is, I'm saying what was the intent of the letter? The intent of the letter was to make sure that the plus that would be awarded for racial How do we know that since the finding doesn't say that? What you're saying is the intent of the letter is to take away racial pluses for people who aren't as diverse as the checkmark in the box would look. So you only need to send it to people who make the advantageous checkmark in the box. But I couldn't find a finding of fact that supported that. But I might have missed it. I'm sorry. There is another finding. And I will put my finger on it here shortly.  One of the things that the plaintiffs pointed out is it's impossible to show any demonstrable effect of this letter. In fact, one of the things, ironically, that they complain about in their brief is not that people got the second chance and took advantage of it, but that people got the second chance and either didn't respond at all or put in something that they characterized or we characterized as perfunctory and were admitted anyway. And so the fact of the matter, if you go back to this entire situation, and by the way, it's only Ms. Smith who suggested if she had the opportunity, there was something else she would have added to her application because she had chosen a different focus in her essay, contrary to what the instructions on the application were. Okay. How do we know from this that this would have changed anything for Ms. Smith? The district court found that if race were totally eliminated as a factor in 1994, there would have been on the order of, I believe, 142 potential slots opened up. And this is on the assumption, using regression analysis, that persons of color are going to get admitted at the same rate as whites with the same scores. Well, there were, at that point, over 160 people left on the admissions committee list. These were people that were contemporaneously judged to be better qualified than Ms. Smith, who had been sent to the admissions committee, referred and evaluated, and on the waiting list in the event that there was people didn't accept the earlier offers. In fact, this turns out to be true also with respect to Mr. Pyle, even to a more extreme degree. So we think, you know, regardless of what you think of the letter, Judge Kleinfeld. Pyle was the gay engineer, right? Correct. Correct. Neither being gay nor having his work experience as an engineer before going to school counted as a diversity factor, is that right? Well, the key factor that was identified in the review of his file was that he was not open about being gay. He was a qualified candidate. In fact, in the subsequent year, he was offered admission to the law school and rejected it. But the fact of the matter is he was in a group in his year where I think less than half of the applicants with his scores were admitted. Our expert calculated there would have been 64 additional offers to whites if any racial preference was eliminated, and there were 160 candidates remaining on the admissions committee list who were white candidates who had been contemporaneously judged to be more qualified than Mr. Pyle. So is that, just so I understand the thrust of that argument, then, are you saying both Smith and Pyle, even if they had been able to supplement, would not have that supplement in response to one of these substantiation letters, would not have tipped the balance in their favor because of other candidates who were, regardless, still better qualified? Correct. And because How would that be known? How did they know that if they weren't ranked according to their supplemented Well, because what we have done here is to say what happens if race is completely eliminated as a factor? And not just taking this little subcomponent of the letter about which it is impossible to know the effect. So we've said if we just eliminate it. I also want to say, I think that plaintiff's analysis of the letter kind of looks through the lens backwards. I mean, the analysis in these cases is not what would have happened if Ms. Smith or any one of the other plaintiffs were of color, but what happens if you take away the challenge practice? Wait a minute. You're changing more than one variable. You're not just saying what would happen if you took away the one variable. You're saying what would happen if you eliminated diversity admission altogether and just admitted people on grades and test scores? And then Pyle and Smith wouldn't have gotten in anyway. By stringing those two things together, I think it may have sounded that way, but that's not what I intended. What I meant to say with respect to the, what's called the ethnicity substantiation letter is, counsel for Ms. Smith is arguing, well, if you call it an ethnicity substantiation letter, and that's important, but I asked before, and as far as I could tell, there wasn't an answer. There doesn't seem to be a finding of fact saying that it's an ethnicity substantiation letter unless I missed it. And I, you're right. I still haven't answered your question because I'm still flipping through it. So I'm worried about your calling it that without challenging it. Well, the findings are at 32 on that, if that's what you're referring to. I might have missed it. They start there. I wanted to ask, too. We were told that the Exhibit 35 wasn't the real letter, and yet that's what the Court is talking about. And Mr. Rossman may have been referring to other versions of the letter that were in individual applicant files that are also in the record. Frankly, I don't recall that there being a difference, but I'm not going to say that there isn't. The findings are with regard to the letter. And ethnicity substantiation letter is not my term. In fact, I think it's the one that the law school staff used and it got picked up in this litigation. I'd like to use it, too, if I was defending it. But I want to know if it's true. It's the term that was used. And the testimony was, as to its purpose, was, as I have indicated, that it was to make sure that an unwarranted plus was not given simply because the case went to trial. I want to read the right findings. The testimony, certainly in the record on that, is from Kathy Swinehart, who is the admissions coordinator. Her testimony is in the transcript. And also of Sandra Madrid, who is the admissions dean. I've got the findings. Just guide me to the language. Now I have to think that when one goes to the conclusions of the law, that we'll find the tie-up to that, Your Honor. I apologize. I should know this. If it comes to you, let me know, Your Honor. I'm sorry. Let me ask you something else that's on my mind. This Hallyu thing in Adirond, there was a mark of phoniness to the Supreme Court. More specifically, it was a marker that showed that Richmond was not trying to redress past discrimination, because despite their history of discrimination against blacks, there hadn't been any allies there to discriminate against. I'm wondering whether the tailoring requirement in the school diversity cases has some analog. It really struck me as it's easy to understand the affirmative action in favor of blacks. But when I see affirmative action in favor of Filipinos, and then you've got this Jewish girl from Moldova who's a refugee because the anti-Semites were beating her up, and she doesn't get any diversity credit, I don't understand it. It seems arbitrary. What's the diversity theory that made this narrow tailoring and not arbitrary? Let me respond to the second part of your question about the Jewish applicant from Moldova. I think if you go to the same portion of the transcript and follow on where that example was used, you'll see other examples of people of Jewish ethnicity who had different background service in the Israeli army is one that I recall that come to mind. So this is not a question of saying, gee, we don't consider persons of Jewish ethnicity with interesting backgrounds. We clearly do. I'm assuming they don't discriminate against Jews like the quotas in the 50s and 60s and before. But what I'm asking about is how come she doesn't get a diversity credit for these diverse characteristics when Filipinos do? Your Honor, I think the question is to — requires you to divide diversity credit from weighing against other applicants. Clearly, not every Asian, I mean, the vast majority of Asians, African-Americans, Native Americans, Filipinos didn't get in either. But they all get diversity credits. It's always a plus for them. Well, it's not necessary. It may not be enough of a plus to get them over the hump, but they all get a plus. Right. And she doesn't get a plus, and I want to know why. I don't frankly think that that's the relevant analysis. The relevant analysis is whether all applicants get a holistic consideration of all of their individual characteristics. And the findings and the testimony here support that they did. What Mr. Rossman's example seems to say is, well, I can plow through these files and find a number of very interesting people who didn't get in, who appear to have nonracial diversity characteristics, and we come back and find people with similar characteristics who did get in, and what's the point? The point really is, to go back to the argument about giving a plus to persons of Asian ethnicity, is the flaw. What I'm asking you is, does there have to be any sort of rationality, anything that you might characterize as narrow tailoring to produce the educational benefits of diversity or anything else, to what ethnic groups get pluses and what groups don't get pluses? Well ---- Let me interrupt, but I found Conclusion of Law No. 13, which talks about ethnicity's differentiation. Thank you for that assist. I'm grateful. Yes. It states that the law school further narrowed its use of race by using the ethnicity substantiation letter. The point I wanted to make is that I don't ---- there's no challenge to awarding a plus to any group, racial minority group, other than Asians, as I understand it. The flaw in the plaintiff's position is that they're assuming that the Asians who would have been admitted based on good grades and test scores are the same as the lower-scoring Asians who were admitted based on diversity characteristics. And the testimony in the record is to the contrary, that the law school went out and looked for people who were fluent in Asian languages, had English as a second language, who were interested in Asian law, in particular who perhaps were recent immigrants to the United States. Seattle has a huge population of Southeast Asian immigrants. So to say this is sort of a ---- How does it help being an Asian Filipino immigrant and not a Moldovan immigrant? I'm still ---- Well ---- I still don't understand. Well, the testimony on this in the record is scanty. To the extent it is, is that ---- There's a history in the West of discrimination against Chinese, but that's ---- And against Filipinos, particularly in the Northwest. And again, though I want to make this ultimate point, to go back because my time is running out, these cases, I use them together, the Michigan cases, this case, kind of going along together as the big challenges to the overall issue of can you use race in admissions and if so, how. This case came up here the first time. Bakke was recognized as authoritative. It came back. Michigan leapfrogged us. We went to trial. We prevailed. Now we're back trying to salvage what sounds from the plaintiff's standpoint like a large issue. And I just want to point out the magnitude of it. By way of background on this Asian preference issue, Asians were about 15.5 percent of the year in question. They were 15 percent of the admittees and 14 percent of the students. Our expert calculated that if Asians had been admitted at the same rate, at the same score level as whites, that the school would have enrolled using the same yield rates as they're called, about 10 percent of its class as Asians in the year in question. That amounts to 13 fewer students over the three years in question, seven of them in 1994, which was a year that had a higher percentage of minority applicants than the other years. So the effect on the plaintiffs is vanishing. I mean, this really is a very carefully calibrated system. The associate dean of the school testified that they looked constantly to see that they were giving a plus to Asian students whose backgrounds fit the academic goals of the school, which are somewhat unique and focused on Asian law. A plaintiff's argument that 10 percent is enough misses the point. The point for affirmative action in this context is to bring in people of different backgrounds, not to go find the smartest, highest-scoring Asians that you can and admit them to your school, even if they happen to all have similar backgrounds, be well-established, have gone to the same schools. The point of diversity is to seek out people that are different, and the record shows that the law school did that in granting a preference to Asians. Thank you.  Thank you, counsel. I want to get to this question of what would have happened if race hadn't been used, but I want to respond to two things. First, the ethnicity substantiation letter. I think Mr. Madden said that a lot of people didn't take advantage of it all, and they still got a significant racial plus. So it clearly wasn't a takeaway, as you suggested, Judge Kleinfeld. And as a takeaway, designed to take away racial pluses. I'm not pointing it at my chin again. I'm sorry. And as all of this analysis, expert analysis, doesn't take into account, that's based upon the applications that were actually filed. Nobody put in any analysis about what would have happened had this letter gone out to whites as well as minorities. The other thing I'd like to point out is that the preference for Asian Americans, finding 82-F, was a racial preference. Now, of course, they did give preferences to people who showed other kinds of diversity, but it was also a racial preference. We have no objection to other kinds of diversity being given a plus. It is the racial preference that concerns us and why we believe, for the reasons that Mr. Batten said, that there would be a significant percentage of Asian Americans in the institution, even without a racial plus, it seems to us that Rutter's admonition that they must have some time limit comes into play. You're saying that they should, because 82-F says Asian candidates were given less preference than African Americans. You're saying that it should be given zero preference. Well, yes, Your Honor. That it wasn't necessary to achieve the compelling interest of diversity. That's what I was trying to say. Now, I would like to just go over this question of whether or not my clients would have been admitted. And there's two important points I want to make. First, that we were entitled to nominal damages under this Court's decision in the State of Masias and separately under Title VI, even if what Mr. Batten is saying was true. And second, we asked for a jury on that very issue, the question of causation. We were entitled to a jury and we were denied it. We asked for a jury on all issues related to damages incurred. You don't need to go past Judge Zilli's own earlier decision to conclude that this question, the same decision question, is in fact related to damages incurred. Judge Zilli said important factors in determining damages would include whether the rejected applicant would have been admitted but for the alleged discriminatory conduct. What do you do with the Lesage case? The Lesage case? Lesage. I apologize. Yes. I'm sorry. Lesage, first of all, Lesage, I think the State of Masias came after Lesage. And second, Lesage did not decide any question under Title VI. And don't forget that the Court has said that Section 1983 follows tort common law remedies, whereas Title VI, they look to contract law remedies. Mr. Madden put in a Rule 28J letter, which I will respond to, but I would like to – in my response, I will probably cite the case of Cronus v. AVX, 612 Northeast 222-289, which describes the difference between tort damages and contract damages when you're talking about nominal damages and other kinds of damages normally associated with contract. I would also like to point out that Judge Zilli did not file any conclusions of law, so we don't know whether the burden-shifting mechanism of Mount Healthy was followed. Defendants at some point are supposed to bear the burden of showing what would have happened. There's no conclusion of law whatsoever in Judge Zilli's opinion which suggests that it was placed upon them. Now, on this specific issue, as we've identified in our brief, a variety of different reasons why we think under any circumstances Judge Zilli was wrong, not only for not having given us a jury, but for the decision themselves, the most important of which I'll just say, the defendant's own expert. As Defendant Cummert himself said that Angela Rock would have been admitted had race been used even in just a slightly different way. Judge Zilli's findings ignored that completely. I think I'm out of time. Thank the Court. We ask that it reverse the judgment of the Court below. Roberts. Thank you, counsel. Smith v. University of Washington is admitted. We're adjourned until 9 a.m. tomorrow. Thanks to both counsel for argument. Thank you both for your helpful argument. All rise. The scope of this session stands adjourned. Thank you.
judges: Dw Nelson, Kleinfeld, Fisher